IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


| | | |
|---|---|---|
| LEVI F. SCHULTZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CV 07-6144-MO |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social | ) | OPINION AND ORDER |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

MOSMAN, J.,

Plaintiff Levi Schultz challenges the Commissioner's decision denying his application for supplemental security income payments under Title XVI of the Social Security Act. I have jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). I AFFIRM the Commissioner's decision.

The court reviews the Commissioner's decision to ensure that proper legal standards were applied and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of the Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). The administrative

1 - OPINION AND ORDER

law judge ("ALJ") applied the five-step sequential disability determination process set forth in 20 C.F.R. § 416.920. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). Mr. Schultz argues the ALJ erroneously assessed his residual functional capacity ("RFC") and elicited testimony from the vocational expert ("VE") with a hypothetical question that did not accurately reflect his functional limitations.

### I.    RFC Asessment

The RFC assessment describes the work-related activities a claimant can still do on a sustained, regular and continuing basis, despite the functional limitations imposed by his impairments. 20 C.F.R. § 416.945(a); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184. The RFC assessment must be based on all the evidence in the case record, and the ALJ must consider all limitations and restrictions. SSR 96-8p, 1996 WL 374184 * 5. Mr. Schultz challenges the RFC assessment on the grounds that the ALJ improperly rejected his testimony and the opinions of two treating physicians. Mr. Schultz also contends the ALJ failed to develop the record regarding his mental impairments.

### A.    Mr. Schultz's Credibility

Mr. Schultz's testimony from the administrative hearing in March 2006 is summarized as follows. He alleged he became unable to work after undergoing back surgery in November 2002. He had a second back surgery in May 2003. Admin. R. 521. He experienced three fainting episodes, the last occurring about a year and a half before the hearing. *Id.* at 525. Mr. Schultz went to the hospital for evaluation of a delusional state in the summer of 2005. *Id.* at 531. He suffers from hemiplegic migraine disorder and gets migraines about twice per week, lasting anywhere from two

hours to three days. *Id.* at 522-23. These are associated with shaking and vomiting at least twice per month. *Id.* at 538.

Mr. Schultz takes Percocet which effectively dulls his back pain for a couple of months at a time and then becomes ineffective. When the medication is not effective, he becomes short-tempered and has trouble walking and standing. This occurs about 75% of the time. He often tries to sleep through the pain. Mr. Schultz tried to sleep all day about twice a week during the year preceding the hearing. *Id.* at 525-27.

Mr. Schultz testified he had been unable to obtain a work release from his medical providers, including Alexis Norelle, M.D., Jennifer Micek, D.O., and Cory Huffine, F.N.P. *Id.* at 535. Dr. Micek gave him a lifting restriction of 20 pounds. *Id.* at 518. Dr. Norelle recommended a third surgery to implant a synthetic disc in his spine and instructed him to discontinue physical therapy. *Id.* at 528-29.

Mr. Schultz worked from August to October 2005 as a mechanic. He worked a lot of overtime and "it ran him into the ground." *Id.* at 520. Mr. Schultz implied in his testimony that his employer permitted special work conditions, such as light lifting, sitting and standing for less than one hour at a time, and extra rest breaks. Despite these accommodations, Mr. Schultz went home early once a week, and took one full week off "because of my back . . . my hands were shaking so bad I couldn't do anything." *Id.* at 519.

The ALJ found Mr. Schultz had hemiplegic migraine with pseudoseizures or a conversion reaction, degenerative disc disease with possible radiculopathy, past injuries to the left hand and right knee, obesity, a history of treatment for mild depression, and a possible learning disability. *Id.* at 22-23. The ALJ found these impairments could reasonably be expected to produce some of the

symptoms Mr. Schultz alleged, but his testimony concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible. *Id.* at 23.

The ALJ accepted that Mr. Schultz could lift and carry no more than 20 pounds occasionally and 10 pounds frequently, sit or stand no more than one hour at a time, be on his feet for no more than 2 hours during an 8-hour workday, and only occasionally use ladders or scaffolds, stoop, kneel, crouch, or crawl. *Id.* The ALJ did not accept Mr. Schultz's testimony that he has functional limitations in excess of these, such as the need for unscheduled rest breaks and days off, or that he is unable to sustain substantial gainful activity.

In deciding whether to accept subjective symptom testimony, an ALJ must perform two stages of analysis. The first stage is a threshold test in which the claimant must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996); *Cotton v. Bowen*, 799 F.2d 1403, 1407-08 (9th Cir. 1986). There is no dispute regarding the first stage in this case.

At the second stage of the credibility analysis, an ALJ may discredit a claimant's testimony regarding the severity of symptoms by providing clear and convincing reasons for doing so. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Smolen*, 80 F.3d at 1283. The ALJ must make findings that are "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).

An ALJ may consider objective medical evidence and the claimant's treatment history, daily activities , and work record. *Smolen*, 80 F.3d at 1284. The ALJ may also consider the observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Id.* In addition, the ALJ may employ ordinary techniques of credibility evaluation, such as the claimant's

prior inconsistent statements concerning the symptoms and other statements by the claimant that appear to be less than candid. *Id.*; SSR 96-7p, 1996 WL 374186.

Here the ALJ considered proper factors and made specific findings to support his credibility determination. The ALJ considered the objective and clinical findings and found they did not support the severity of symptoms Mr. Schultz claimed.

Mr. Schultz slipped and fell in November 2002. Clinical findings suggested radiculopathy and an MRI scan showed a herniated disc at L4-5. Admin. R. at 367-69. Dr. Norelle performed decompression surgery. *Id.* at 191-92. Afterwards, Mr. Schultz had no sensory or motor loss, and reported pain only at the site of the surgical wound. *Id.* at 206-07. After two weeks, Mr. Shultz reported his lower back pain was much better and he did not require pain medication. *Id.* at 366. In December 2002, Mr. Schultz had a normal gait, regularly took walks, and participated in physical therapy. *Id.* at 365.

In January 2003, Mr. Schultz reported a recurrence of lower back pain, after apparently re-injuring himself in another falling mishap. An MRI did not reveal a recurrence of disc herniation, discitis, or other likely cause of the increased pain. *Id.* at 364-65, 385. In March 2003, however, a discogram was positive for concordant pain at the L4-5 level. *Id.* at 360, 381-82. Post discography images showed recurrent broad based herniation at L4-5. All other levels of the lumbar spine appeared normal. *Id.* at 244-45, 383. On May 20, 2003, Dr. Norelle performed fusion surgery at L4-5. *Id.* at 251-53. Post operative CT and x-ray images showed a good completed fusion. *Id.* at 256, 358, 379. Over the following months, Mr. Schultz's physical examinations were normal and x-rays showed no complications from the surgery. He required only occasional Norco for pain relief. *Id.* at 354-56, 377-78.

In April 2004, a CT scan of the lumbar spine showed a good fusion with mild listhesis. Dr. Norelle obtained normal results on physical examination. Mr. Schultz continued to claim pain in the lumbar spine, and Dr. Norelle ordered another MRI and discogram to evaluate the potential for fusion surgery at L5-S1. *Id.* at 353, 376. The lumbo-sacral MRI showed good post operative appearance without evidence of canal or foraminal compromise. *Id.* at 375. In May 2004, after yet another falling episode in which Mr. Schultz apparently re-injured his back, x-ray images of the lumbar spine showed no evidence of misalignment or fracture. *Id.* at 447, 449. Dr. Norelle obtained normal findings on physical examination and an MRI showed no new herniation or stenosis. *Id.* at 352. A three level lumbar discogram was normal except minor intradiscal fissuring without evidence of herniation at L5-S1. The test produced no concordant pain. A post discography CT scan was also negative. *Id.* at 371-74. In July 2004, a nerve conduction study was mildly abnormal in a manner consistent with right-sided lumbar radiculopathy, although the findings were not diagnostic. *Id.* at 348-49.

In February 2005, an x-ray series of the lumbar spine showed no failure or weakening of the L4-5 fusion. The images were otherwise unremarkable. *Id.* at 422. In September 2005, a whole body bone scan was normal. *Id.* at 475. In January 2006, radiographic images showed no change over the preceding year. *Id.* at 474.

It was not unreasonable for the ALJ to conclude from the foregoing medical evidence that Mr. Schultz's back pain commenced in November 2002 and substantially improved after fusion surgery in May 2003. All objective and clinical findings thereafter were normal except for a mildly abnormal, but less than diagnostic nerve conduction study. The ALJ could reasonably find this medical evidence undermined Mr. Schultz's testimony that 75% of the time back pain makes it

difficult for him to stand or walk, makes him short-tempered, and causes him to frequently try to sleep all day to avoid the pain. *See Rollins v. Massanari,* 261 F.3d 853, 857 (9th Cir. 2001)(Medical evidence is relevant in determining the severity of a claimant's pain and its disabling effects).

This testimony is further undermined by the treatment record, which shows Mr. Schultz required pain medication only occasionally, and by his reports to treating sources which are not consistent with his more recent statements. Contrary to Mr. Schultz's more recent claims of ongoing debilitating symptoms making standing and walking difficult, his prior statements to treating sources reveal that by July 2003, Mr. Schultz was participating in physical therapy, walking daily, and reporting no lower back or lower extremity pain or weakness. *Id.* at 357. By October 2003, he was able to hike ten miles, walk daily, and engage in physical therapy and weight training, *Id.* at 355, 396. By April 2004, Mr. Schultz was reporting back pain only with sitting, bending and walking more than three miles. *Id.* at 353. The ALJ could rationally conclude these activities suggested his back symptoms had subsided and that his more recent claims of ongoing debilitating pain are not entirely credible. *See Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir. 1998) (ALJ may consider activities inconsistent with the claimant's alleged limitations in determining credibility).

Similarly, the evidence does not support Mr. Schultz's claims of debilitating symptoms from seizures or migraines with associated vomiting and shaking. Admin. R. 532-33, 538. Mr. Schultz complained of seizures in September 2001. All clinical findings were within normal limits. *Id.* at 145-46. A comprehensive evaluation, including an echocardiogram study, chest x-rays, Lyme disease antibody study, complete blood count, chemistry panel, thyroid panel, liver enzyme study, electroencephalogram (EEG), and six weeks of heart activity event monitoring, was completely normal. *Id.* at 137-51, 157.

In December 2001, Mr. Schultz reported 3 weeks of headaches with left sided hemiparesis, preceded by a possible seizure episode. Joel Daven, M.D., performed another complete neurological evaluation, including an EEG, CT scan of the brain, MRI scan of the brain, laboratory tests, and a physical examination. These failed to produce abnormal results and Dr. Daven was highly suspicious of a nonorganic etiology. *Id.* at 174-75, 179, 181, 182.

In January 2002, Mr. Schultz consulted Susan Morton, M.D., for another neurological evaluation of his headaches and possible seizures. Dr. Morton found these episodes were symptoms of hemiplegic migraine disorder. She started Topamax for prophylactic management. *Id.* at 276-79. In March 2002, Dr. Morton obtained normal results on examination and Mr. Schultz reported milder and less frequent headaches with Topamax. *Id.* at 275. In the succeeding months, Mr. Schultz continued to improve with increased doses of Topamax and Amitriptyline. In June 2002, Mr. Schultz reported only occasional headaches relieved by non-prescription Advil. *Id.* at 273. He did not have seizure-like episodes or fainting spells during this time.

In January 2003, shortly after the alleged onset of disability, the migraines were fairly well controlled by Topamax. *Id.* at 269. By July 2003, Mr. Schultz had not had a migraine for over seven months. Dr. Morton opined his hemiplegic migraine disorder was stable and controlled by Topamax. *Id.* at 268. Mr. Schultz did not complain of migraines to treating sources thereafter.

Dr. Morton was convinced Mr. Schultz's seizure-like fainting spells had been symptoms of his migraine disorder. In August 2003, Dr. Morton responded unequivocally on a Seizure Questionnaire by stating "he does not have seizures." *Id.* at 266-67. Mr. Schultz reported one additional seizure-like episode in December 2004. He was in a completely normal and alert state by the time he reached the emergency room 15 to 30 minutes later. He had a completely normal

physical examination and objective test results. He was instructed to increase his Topamax dosage. *Id.* at 438-39. He did not report seizure-like symptoms thereafter and testified he did not have any additional seizures. *Id.* at 525.

The ALJ could reasonably conclude from the treatment record that Mr. Schultz did not have a seizure disorder, but suffered from hemiplegic migraines with associated fainting episodes and nausea. These symptoms had largely resolved by the alleged onset of Mr. Schultz's disability in November 2002. In January 2003, his headaches were mild and infrequent and in July 2003, he had not had any headache for several months. Thereafter, he did not seek treatment for headaches or report migraines to any medical provider, although he obtained treatment for other conditions. A claimant's failure to seek treatment despite claims of debilitating symptoms is a sufficient reason to disregard his subjective testimony about the symptoms. *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001).

The ALJ could reasonably find this evidence undermined Mr. Schultz's testimony that he suffers ongoing debilitating hemiplegic migraines about twice per week, lasting anywhere from two hours to three days, with associated shaking and vomiting at least twice per month. *Id.* at 538. It was not irrational for the ALJ to conclude that these symptoms were controlled by Topamax.

The ALJ also found Mr. Schultz exaggerated some symptoms so greatly they appeared to be fabricated. *Id.* at 24-25. In May 2005, Mr. Schultz told nurse practitioner Huffine he had been diagnosed with a type of malignant bone cancer, and failed a trial of Procarbazine therapy. *Id.* at 425, 465. In July 2005, he told his counselor, Jeri Graham, M.S.W., L.C.S.W., that Michael O'Neill, M.D., had diagnosed the cancer and estimated a life expectancy of five years, with severe pain during the final 18 months. *Id.* at 484.

In fact, Dr. O'Neill never examined or treated Mr. Schultz.  No physician diagnosed him with cancer and no pharmacist prescribed Procarbazine as he claimed.  His family took him to the hospital for a behavioral health consultation to determine why he would fabricate the cancer diagnosis.  When confronted with the truth, Mr. Schultz did not persist in his claim or become aroused emotionally; he was simply "relieved" and "curious why he would be thinking that way."  He was reportedly diagnosed with a "fixed delusional state," which did not pose risks of harm to himself or others or require admission to a psychiatric facility.  *Id.* at 465, 483.

Mr. Schultz argues the ALJ should have considered the possibility that his false claim of terminal illness and other inconsistencies in his statements were symptoms of an underlying psychiatric impairment.  For the purpose of determining credibility, however, it makes little difference whether a claimant's statements are false due to fabrication or mental illness; in either case the statements are unreliable.  Mr. Schultz's related argument that the ALJ was required to develop the record more fully regarding his potential mental impairments is addressed later in this opinion.

In summary, the ALJ's reasons for partially discrediting Mr. Schultz's testimony, including the generally mild medical findings, the demonstrated effectiveness of appropriate treatment, Mr. Schultz's demonstrated ability to engage in activities inconsistent with his testimony, and inconsistencies between his contemporaneous statements to treating sources and his current allegations, are clear and convincing and rest on reasonable inferences drawn from the record as a whole.  *Smolen v. Chater*, 80 F.3d at 1284; SSR 96-7p, 1996 WL 374186.  The ALJ's findings are sufficiently specific to permit the court to conclude he did not discredit Mr. Schultz's testimony

arbitrarily. *Orteza v. Shalala*, 50 F.3d at 748. Accordingly, the ALJ's credibility determination will not be disturbed.

    **B.**    <u>**Opinions of Treating Physicians**</u>

        Mr. Schultz contends the ALJ improperly discounted the opinions of Drs. Norelle and Micek. As described previously, Dr. Norelle performed a bilateral L4-5 discectomy in November 2002. Admin. R. 191-92. Mr. Schultz did much better after surgery, but fell and re-injured his back. *Id.* at 365. Dr. Norelle performed fusion surgery in May 2003. *Id.* at 244-45. On October 10, 2003, she wrote the following:

> To Whom It May Concern: . . . Levi Schultz continues to be disabled
> for at least a year due to undergoing lumbar spine surgery.

*Id.* at 481A.

        The ALJ gave Dr. Norelle's statement scant weight in his decision. *Id.* at 24. Generally, a treating physician's opinion is afforded great weight in disability cases. *Ramirez v. Shalala*, 8 F.3d 1449, 1453 (9th Cir. 1993). However, whether a claimant is employable is not a medical opinion about specific functional limitations, but an administrative finding that the regulations reserve to the Commissioner. Opinions on issues reserved to the Commissioner cannot be given controlling weight or special significance, even when offered by a treating physician. 20 C.F.R. § 416.927(e); SSR 96-5p, 1996 WL 374183, *2-3. Accordingly, Dr. Norelle's opinion that Mr. Schultz was disabled is not entitled to special weight.

        If a treating physician's opinion is not contradicted by another physician, then the ALJ may reject it only for clear and convincing reasons. *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002). The ALJ pointed out that Dr. Norelle did not identify clinical findings to support her opinion.

Indeed, Dr. Norelle's progress notes indicate generally benign findings on physical examinations. Diagnostic images consistently showed a good fusion without signs of complications. Admin. R. 256, 352-53, 374-79, 422, 474.

Similarly, Dr. Norelle did not identify specific functional deficits or work-related activities Mr. Schultz could not perform.  Mr. Schultz's own subjective reports are inconsistent with Dr. Norelle's assessment.  One month after surgery, Mr. Schultz told Dr. Norelle he was doing well and reported back pain only with standing or sitting for extended periods. *Id.* at 358.  In July 2003, two months after surgery, Mr. Schultz told Dr. Norelle he was walking daily and had no pain or numbness in the lower back or lower extremities. *Id.* at 357.  In August 2003, he reported some back and leg pain, but required pain medication only occasionally.  At the time of Dr. Norelle's disability opinion, his physical examination was benign and he continued to report only occasional pain requiring medication. *Id.* at 355.

The ALJ also noted that Mr. Schultz continued to improve after Dr. Norelle issued her disability opinion.  On October 28, 2003, Mr. Schultz endorsed continuing improvement and described hiking up to 10 miles. *Id.* at 396.  In April 2004, Mr. Schultz had pain with sitting, bending, and walking more than three miles. *Id.* at 353.  In May 2004, a three-level lumbar discography did not produce concordant pain at any level and was generally normal. *Id.* at 371-74.

An ALJ may properly reject a physician's opinion that is conclusory and unsupported by clinical findings. *Meanal v. Apfel*, 172 F.3d 1111, 1117 (9th Cir. 1999).  Here, all clinical findings, objective diagnostic images, and subjective reports indicated a successful surgery that significantly reduced Mr. Schultz's pain and improved his functional capacity.  The ALJ's assessment of Dr. Norelle's opinion is consistent with the record as a whole.

Mr. Schultz asserts that Dr. Norelle's opinion is supported by contemporaneous x-rays showing mild to moderate disc space narrowing at L5-S1, consistent with degenerative disc disease. Admin. R. 378. He also cites a lumbar CT scan from April 2004, showing some mild narrowing at the L3-4 disc space and slight retrolisthesis at L5-S1. *Id.* at 376. Finally, Mr. Schultz relies on a nerve conduction study from July 2004, which was mildly abnormal in a manner that suggested possible radiculopathy, but not sufficiently to be diagnostic. *Id.* at 349. The ALJ acknowledged these findings, but did not find them consistent with disability, given the mild to moderate degree of the abnormalities shown, the absence of abnormal findings in other diagnostic tests, and Mr. Schultz's reported improvement and activity level. *Id.* at 24. In addition, these findings could not have been the basis of Dr. Norelle's opinion which predated them.

In essence, Mr. Schultz's argument asks the court to substitute his interpretation of the evidence for that of the Commissioner. Even if these findings could reasonably be interpreted as Mr. Schultz claims they should have been, the court may not substitute its view of the evidence where "the evidence is susceptible to more than one rational interpretation." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). Under such circumstances, the Commissioner's interpretation must be affirmed. *Id.*

Dr. Micek began providing primary care to Mr. Schultz in September 2005. Admin. R. 462. Mr. Schultz reported lower back pain with some weakness in the legs and depression. *Id.* Dr. Micek prescribed Lexapro for depression and Amitriptyline to help with his lower back pain. *Id.* In November 2005, Mr. Shultz said the new therapy was helping with both problems. He continued to have intermittent pain but was able to do his activities of daily living. *Id.* at 461. In January 2006, Mr. Schultz complained of worsening back pain over the previous two weeks. *Id.* at 459. In March

2006, Dr. Micek diagnosed chronic lumbar radiculopathy and prescribed Percocet for his lower back pain. *Id.* at 13.

On April 20, 2006, Dr. Micek completed a check-box form provided by Mr. Schultz's attorney. The form asked Dr. Micek to indicate whether she believed Mr. Schultz could perform work in the light and sedentary categories of exertion, as defined in the regulations, on a sustained basis. Dr. Micek indicated he could sustain sedentary work but not light work. *Id.* at 509. Dr. Micek indicated Mr. Schultz's medical impairments would make him unable to maintain a normal work schedule 2 days per month. *Id.* at 510.

The ALJ rejected Dr. Micek's opinion in favor of the opinions of state agency medical and psychological consultants. *Id.* at 25. The ALJ noted that Dr. Micek failed to identify clinical findings or observations that supported her conclusion. *Id.* Her progress notes reflect that Mr. Schultz consistently had negative bilateral straight leg raise tests for radiculopathy and full strength in the lower extremities. *Id.* at 459, 462. The ALJ was entitled to discount such a conclusory and unsupported opinion. *Meanal v. Apfel*, 172 F.3d at 1117.

The ALJ pointed out that Mr. Schultz admitted the ability to lift 20 pounds, consistent with the lifting requirements of light work. Admin. R. 109, 518. Mr. Schultz admitted the ability to sit or stand for one hour at a time, consistent with the limited range of light work found in the ALJ's RFC assessment. *Id.* at 518-19. Based on Mr. Schultz's admissions and Dr. Micek's failure to make a finding of specific functional limitations inconsistent with the requirements of light work, the ALJ could reasonably find Dr. Micek's opinion less convincing than those of the state agency experts.

The ALJ also rejected Dr. Micek's opinion that Mr. Schultz would miss two days of work per month due to the severity of his impairments. In the absence of clinical findings or observations

by Dr. Micek to support this opinion, the ALJ logically concluded it was based on Mr. Shultz's subjective reports. *Id.* at 25. An ALJ can properly reject a physician's opinion that is premised on the claimant's own subjective complaints of symptoms which the ALJ properly found unreliable. *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

The ALJ's reasons for rejecting Dr. Micek's opinion in favor of the state agency consultants' opinions are clear and convincing and supported by inferences reasonably drawn from the record as a whole. Accordingly, the ALJ's evaluation of Dr. Micek's opinion will not be disturbed.

### C.    Development of the Record

Mr. Schultz contends the ALJ failed to develop the record with respect to his mental impairments. He argues the ALJ should have ordered a consultative psychological evaluation

In social security disability cases, the initial burden of proving disability is on the claimant. *Bowen v. Yuckert*, 482 U.S. 137, 146 & n.5; *Burch v. Barnhart,* 400 F.3d 676, 679 (9th Cir. 2005). Under the regulations, it is the claimant's responsibility to provide medical evidence showing that he has an impairment and how severe it is. 20 C.F.R. §§ 416.912(a), (c).

Concurrently, "the ALJ has a duty to assist in developing the record." *Reed v. Massanari,* 270 F.3d 838, 841 (9th Cir. 2001) (quoting *Armstrong v. Comm'r of the Soc. Sec. Admin.,* 160 F.3d 587, 589 (9th Cir. 1998)). An ALJ assists in developing the record by requesting records and reports from physicians identified by the claimant. 20 C.F.R. § 416.919(d). The ALJ may order a consultative evaluation if the information available from the claimant's source is inadequate or ambiguous and the source does not provide clarification. *Id.* § 416.912(f). The ALJ's duty to conduct an appropriate inquiry is triggered only when the evidence is ambiguous or when the record

is inadequate to allow for proper evaluation of the evidence. *Mayes v. Massanari,* 276 F.3d 453, 459-60 (9th Cir. 2001); *Tonapetyan v. Halter,* 242 F.3d at 1150 ; *Smolen v. Chater,* 80 F.3d at 1288.

Mr. Schultz again relies on the check-box form completed by Dr. Micek.  She responded affirmatively to the question whether she would recommend a comprehensive psychological evaluation to assess "depression and concentration deficits, and to assess any other psychological impairments."  Admin. R. 510.  Her treatment records are neither ambiguous nor inadequate, however.  They indicate she provided Mr. Schultz with antidepressant medications and he responded favorably. *Id.* at 11, 457, 461, 462.  There is no indication in Dr. Micek's records that Mr. Schultz had functional deficits from depression, concentration difficulties, or any other psychological impairment.  Accordingly, Dr. Micek's recommendation of a comprehensive psychological evaluation was not based on circumstances that would trigger the ALJ's duty to develop the record.

Mr. Schultz's delusional reports of a cancer diagnosis reasonably raise the question whether he fabricated the story or suffered a brief and atypical psychotic episode.  The records do not, however, present any ambiguity as to his ongoing mental functional capacity.  The delusion lasted only until he was confronted with the truth, after which he was relieved and had no further psychotic symptoms. *Id.* at 465, 483.  Other than this brief episode, no treating source has mentioned any indication that Mr. Schultz has delusions, hallucinations, or an impaired grasp of reality.  He has not been treated with anti-psychotic medications.

Mr. Schultz also relies on diagnoses suggested by his counselor, social worker Jeri Graham.  Graham had regular counseling sessions with Mr. Schultz from March 2000 to June 2001, while he was in high school and long before the alleged onset of his disability.  At the end of that period, she diagnosed Major Depressive Disorder, Mild. *Id.* at 487.

Graham counseled Mr. Schultz again in July 2005, when he reported depression associated with his recent diagnosis of terminal cancer. *Id.* at 484. Graham did not know the cancer diagnosis was fictitious, and diagnosed Major Depressive Disorder, Moderate. She assessed Mr. Schultz's functioning on the Global Assessment of Functioning (GAF) scale at 48, indicating serious impairment of function. *Id.*

The ALJ did not accept Graham's diagnosis because she is not an acceptable medical source as defined in the regulations. *See* 20 C.F.R. § 416.913. He correctly found that Graham's treatment records did not reflect significant mental functional difficulties other than situational depression manifesting in conflicts within his family and brief worry over the delusion that he had terminal cancer. As noted previously, his delusion and the associated depression resolved quickly and there is no evidence of ongoing impairment in Graham's treatment records. Accordingly, Graham's records do not present an ambiguity that would trigger the ALJ's duty to investigate further.

Mr. Schultz relies on Dr. Daven's treatment notes from before the alleged onset of his disability. When Dr. Daven was unable to find an organic cause for Mr. Schultz's headaches and associated symptoms, he suspected a nonorganic etiology "which might include a conversion reaction." *Id.* at 175. Graham replied to this by stating she had found no evidence of a Conversion Disorder while counseling Mr. Schultz. *Id.* at 487. This apparent dispute does not create an ambiguity, however, because Mr. Schultz's headaches and associated symptoms were ultimately found to be symptoms of hemiplegic migraine disorder and were successfully treated with Topamax. *Id.* at 276-79.

Finally, Mr. Schultz cites his high school records which indicate he performed at below grade level in written expression and spelling and had difficulty with motivation and completing

homework assignments. *Id.* at 126-27. He was able maintain passing grades in all his classes, with assistance from resource room support staff who helped him complete tasks in a timely manner. *Id.* at 123. The ALJ acknowledged Mr. Schultz's history of special education and learning problems. *Id.* at 23. He accommodated the functional limitations identified in the school counselor's evaluation by limiting the RFC assessment to work activities requiring him to understand and implement only simple tasks and precluding work requiring him to establish his own work plans and goals. *Id.* at 23. These limitations reasonably reflect the limitations identified in the school records and are supported by the opinions of the state agency consulting psychologists. *Id.* at 325, 331.

Mr. Schultz has failed to produce evidence of additional functional limitations from mental impairments. This does not render the record inadequate to reach a determination. When a claimant fails to produce medical evidence to substantiate the impairments he claims, it is appropriate for the ALJ to reach a determination that he is not disabled. *Ukolov v. Barnhart,* 420 F.3d 1002, 1005 (9th Cir. 2005); SSR 96-4p, 1996 WL 374187 at *1-2.

## II.    <u>Vocational Evidence</u>

Mr. Schultz contends the ALJ failed to satisfy the Commissioner's burden at step five of the decision-making process. If a claimant demonstrates he cannot perform his past work, then the burden shifts to the Commissioner to establish that there are a significant number of jobs in the national economy the claimant can do. *Tackett v. Apfel,* 180 F.3d 1094, 1099 (9th Cir. 1999). The Commissioner can satisfy this burden by eliciting the testimony of a VE with a hypothetical question that sets forth all the limitations of the claimant. *Id.*; *Andrews v. Shalala*, 53 F.3d at 1043.

Here, the ALJ elicited testimony from the VE based on the ALJ's RFC assessment. Admin. R. 540. Mr. Schultz's challenges to the ALJ's RFC assessment cannot be sustained for the reasons

previously discussed.  The ALJ was not required to incorporate additional limitations he found not supported by the record.  *Osenbrock v. Apfel,* 240 F.3d 1157, 1163-65 (9th Cir. 2001); *Magallanes v. Bowen*, 881 F.2d 747, 756-57 (9th Cir. 1989).  The ALJ properly relied on the VE's testimony because it was elicited with a hypothetical question which "contained all of the limitations that the ALJ found credible and supported by substantial evidence in the record." *Bayliss v. Barnhart,* 427 F.3d 1211, 1217 (9th Cir. 2005).

The VE testified that a person with the RFC described by the ALJ could perform the work activities required in the occupations microfilm document preparer, assembler, and bench assembler, which represent thousands of jobs in the national economy.  Admin. R. 541.  Accordingly, Mr. Schultz's contention that the Commissioner's determination was based on improper vocational testimony cannot be sustained.

For the foregoing reasons, the ALJ's decision is based on correct legal standards and supported by substantial evidence.  The Commissioner's final decision is AFFIRMED.

DATED this   2nd   day of October, 2008.


/s/ Michael W. Mosman
Michael W. Mosman
United States District Judge


19 - OPINION AND ORDER